10 F.3d 547
 63 Fair Empl.Prac.Cas. (BNA) 479,
63 Empl. Prac. Dec. P 42,725
Walter JOHNSON, Appellant,
v.
ARKANSAS STATE POLICE, Arkansas State Trooper Commission,
Tommy Goodwin, in his official capacity, Gene Raff, in his
official capacity; Winthrop Rockefeller, in his official
capacity; John Gillespie, in his official capacity; Vada
Sheid, in his official capacity; Bill Simpson, in his
official capacity; Howard Woods, in his official capacity;
Jerry Flippo, in his official capacity; David Rosegrant, in
his official capacity; and Houston Talley, in his official
capacity, Appellees.
 No. 92-3611.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 15, 1993.
Decided Nov. 29, 1993.
 
 R.S. McCullough, argued, Little Rock, AR (Rita F. Bailey, on the brief), for appellant.
 Ann C. Purvis, Asst. Atty. Gen., argued, Little Rock, AR, for appellees.
 Before BOWMAN, Circuit Judge, HEANEY, Senior Circuit Judge, and BEAM, Circuit Judge.
 BEAM, Circuit Judge.
 
 
 1
 Walter Johnson appeals the district court's ruling in favor of the Arkansas State Police ("ASP") and the individual defendants in his Title VII claim. We reverse and remand.
 
 I. BACKGROUND
 
 2
 Walter Johnson, an African-American, was hired by the ASP as a uniformed trooper in June of 1980. His performance as a uniformed trooper was satisfactory. In 1984, he was assigned to the Criminal Investigation Division ("CID") and became an undercover narcotics agent. In 1986, complaints about Johnson's record-keeping began to surface. His poor record-keeping was the subject of several counseling sessions between Johnson and his superior officers. Subsequently, in 1987, an Internal Affairs audit of Johnson's case files revealed that his records had not been properly completed since August 1986. The auditors found that Johnson had falsified entries in his weekly reports, had dictated reports improperly, and was guilty of insubordination. Based on these findings, Johnson was suspended without pay for five days and was reassigned as a uniformed trooper with the highway patrol.
 
 
 3
 On August 18, 1987, Johnson was arrested and charged in state court with one count of theft of property in connection with money missing from a CID narcotics investigation. On August 21, 1987, Arkansas State Police Chief Tommy Goodwin informed Johnson that he would be suspended without pay pending the outcome of the criminal charge. A jury acquitted Johnson of the theft charge and he subsequently requested reinstatement to the highway patrol. Goodwin refused to reinstate Johnson and instead terminated his employment. Johnson appealed this decision to the Arkansas State Police Commission which unanimously upheld Goodwin's determination. Johnson filed an EEOC complaint and then filed this lawsuit.
 
 
 4
 Testimony at trial showed that in making his decision to terminate Johnson's employment, Goodwin relied on the ASP's Internal Affairs investigation which had concluded that despite the acquittal, Johnson had indeed taken the money from the narcotics investigation. He also relied on a letter from a prosecuting attorney concerning missing evidence in two other narcotics investigations, and the recommendation of Captain Talley, Johnson's superior at the highway patrol. Talley suggested that Johnson should not be reinstated because of his poor personal appearance, low work activity, and damaged credibility as a law enforcement officer in the community. Talley testified, however, that he had never reprimanded Johnson for his appearance or for the quality of his work product.
 
 
 5
 The district court analyzed this case as a disparate treatment case under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). After a bench trial, the court concluded that Johnson was not qualified to be a state trooper and that Johnson therefore failed to establish a prima facie case. In the alternative, the district court found that the ASP advanced legitimate nondiscriminatory reasons for Johnson's dismissal and that Johnson failed to prove that these reasons were pretextual. Johnson appeals these findings.
 
 II. DISCUSSION
 A. Prima Facie Case
 
 6
 McDonnell Douglas provides a three-stage framework for analyzing employment discrimination cases: (1) prima facie case; (2) nondiscriminatory reasons; and (3) pretext. McDonnell Douglas, 411 U.S. at 801-04, 93 S.Ct. at 1823-25; Adams v. Nolan, 962 F.2d 791, 794 (8th Cir.1992) (citing Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)). Under McDonnell Douglas a Title VII plaintiff must first establish a prima facie case. In this case, Johnson had the initial burden of showing: (a) that he is a member of a protected class; (b) that he was qualified for the position; and (c) that he was fired from the position. McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. at 1824. If Johnson succeeded in establishing a prima facie case, the burden then shifted to the ASP to articulate some legitimate, nondiscriminatory reason for Johnson's termination. Id. Should the ASP have succeeded in carrying this burden, Johnson must then have had the opportunity to prove by a preponderance of the evidence that the reasons articulated by the defendant were a pretext for discrimination. Id. Under a mixed-motives analysis, however, " '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " Saint Mary's Honor Ctr. v. Hicks, --- U.S. ----, ----, 113 S.Ct. 2742, 2753, 125 L.Ed.2d 407 (1993) (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)).
 
 
 7
 The district court concluded that Johnson failed to demonstrate that he was qualified to be a state trooper and that he therefore failed to establish a prima facie case. Our review of the record reveals that this determination is an error of law. The threshold of proof necessary to make a prima facie case is minimal and the district court improperly conflated the prima facie case with the ultimate issue in this Title VII case. See Saint Mary's Honor Ctr. v. Hicks, --- U.S. ----, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (describing requirements of the prima facie case as minimal); see also United States Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 713-15, 103 S.Ct. 1478, 1480-81, 75 L.Ed.2d 403 (1983) (distinguishing between the prima facie case and the ultimate issue in a Title VII case).
 
 
 8
 In deciding that Johnson failed to establish a prima facie case, the district court relied heavily on evidence of Johnson's performance at CID. The court concluded that because Johnson was not qualified to be an undercover investigator, he was similarly unqualified to be a uniformed patrol officer. If Johnson were making a Title VII claim requesting reinstatement to CID, we would agree with the district court that he could not establish a prima facie case. However, the district court considered the wrong job description when analyzing Johnson's prima facie case. The fact that Johnson was not qualified to be an undercover narcotics investigator is not material to his qualifications to be a highway patrol officer. This misunderstanding infected the rest of the court's analysis.
 
 
 9
 The other evidence on which the district court relied to determine that Johnson failed to make a prima facie case similarly does not support a finding that Johnson was not qualified for the position of a state trooper. The court noted that Talley recommended to Goodwin that Johnson not be reinstated because his uniform was below par and because he wrote too few tickets.[1] These facts do not render him unfit for the job for Title VII purposes. Given the fact that Johnson was neither reprimanded nor given any indication that there were problems with his job performance, Transcript Vol. I, pp. 55-56, this information is legally insufficient to support the conclusion that Johnson failed to present a prima facie case.
 
 
 10
 The court also credited the ASP's assertions that Johnson had lost "credibility as an officer." In the abstract, it may seem reasonable to conclude that a police officer accused of a felony loses credibility with the public as a result of the notoriety and publicity of a trial, regardless of outcome. However, evidence was adduced at trial that white officers accused of felony offenses were not deemed by ASP to have lost their credibility as a result of the attendant publicity of a trial. Goodwin testified that the Mullenax and Booher cases, involving white officers accused of felonies, generated significantly more media coverage than Johnson's case.[2] However, neither Mullenax nor Booher was terminated because of a loss of credibility. We cannot accept that Johnson lost his credibility as a state trooper while similarly situated white officers were not so affected. Accordingly, the district court erred as a matter of law in concluding that Johnson failed to make a prima facie case of discrimination.
 
 B. Finding of No Discrimination
 
 11
 In the alternative, the district court concluded that the defendants had advanced legitimate nondiscriminatory reasons for Johnson's termination and that Johnson failed to prove that these reasons were pretextual. Our review of the district court's findings of fact is governed by Federal Rule of Civil Procedure 52(a) which provides that a finding of fact "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." A factual finding is clearly erroneous if it is not supported by substantial evidence in the record, if it is based on an erroneous view of the law, or "if the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). In addition, a district court's findings are clearly erroneous if they "fail to recognize [important] incidents and reject or fail to draw inferences which ... [the reviewing court] found inescapable from the record." Griffin v. Omaha, 785 F.2d 620, 628 (8th Cir.1986) (quoting Alexander v. Nat'l Farmers Org., 687 F.2d 1173, 1203 (8th Cir.1982), cert. denied, 461 U.S. 937, 103 S.Ct. 2108, 77 L.Ed.2d 313 (1983)). After careful examination of the record, we are convinced that the district court's findings are not supported by the evidence. See Anderson v. Bessemer City, 470 U.S. 564, 571-74, 105 S.Ct. 1504, 1510-11, 84 L.Ed.2d 518 (1985).
 
 
 12
 In its alternative holding, the district court relied primarily on the defendants' testimony that their conduct was not racially motivated. The district court acknowledged that this testimony was self-serving, but found it credible in light of the other evidence presented at trial. Ordinarily, a credibility determination cannot be clear error. However, in this case, the district court acknowledged that the defendants' testimony was highly suspect and found it credible in large part because it was supported by external evidence. In particular, the district court noted "the lack of any indicia of racial discrimination in his [Johnson's] suspension and ultimate discharge." Johnson v. Arkansas State Police, No. LR-C-91-16, mem. op. at 7, (E.D.Ark. September 30, 1992). Our examination of that extrinsic evidence convinces us that there are significant indicia of racial discrimination and that the evidence contradicts rather than supports the defendants' testimony. Where documentary or objective evidence contradicts witness testimony, an appellate court may reverse even a finding purportedly based on a credibility determination. Anderson, 470 U.S. at 575, 105 S.Ct. at 1512; Griffin, 785 F.2d at 626.
 
 
 13
 The record is replete with evidence of disparate treatment between Johnson and his white co-workers with regard to his suspension without pay. For example, Trooper Davis, a white officer, was charged with theft by deception. He was suspended with pay during the investigation, and when the charges were dropped, he was reinstated. Transcript Vol. I, p. 96. Trooper Cook, a white officer, was charged with a theft offense in connection with a credit card scam. He was also suspended with pay until he pled guilty. Transcript Vol. I, p. 98-99. Investigator Papas, a white officer, was charged with driving while intoxicated ("DWI"). He was suspended with pay during the investigation and upon his guilty plea, was suspended without pay. Transcript Vol. I, p. 102-04. Sergeant Mullenax, a white officer, was charged with first degree murder. He was suspended with pay throughout the investigation and trial, and the suspension was lifted the day he was acquitted. Transcript Vol. I, p. 115. Trooper Anderson, a white officer, was suspended with pay pending an investigation of homicide allegations. Transcript Vol. I, p. 127. Trooper McMullen, a white officer, was charged with conspiracy to possess marijuana. He was suspended with pay until his conviction. Transcript Vol. I, p. 128. Trooper Miller, a white officer, was charged with sexually abusing two girls. He was suspended with pay until the charges were resolved. Transcript Vol. I, p. 128. All of these white officers were suspended with pay pending the outcome of a felony criminal investigation or trial. Johnson, by contrast, was suspended without pay when he was charged with felony theft.
 
 
 14
 The evidence the ASP presented of instances in which black officers were suspended with pay are readily distinguishable from the cases of the white officers listed above. Almost every case in which a black officer was suspended with pay involved a minor infraction,[3] and none involved a significant duration of time. This extrinsic evidence from the ASP's own files renders suspect the officers' assertions that they acted in a race-neutral fashion. In addition, we have already determined that the "loss of credibility as a police officer" standard has been inconsistently applied. Therefore, the district court was incorrect when it concluded that the extrinsic evidence supported the officers' denials of discrimination.[4] The district court's failure to account for this extrinsic evidence when concluding that "the Arkansas State Police has disciplined its troopers in a basically evenhanded manner regardless of race," Johnson v. Arkansas State Police, mem. op. at 8, constitutes reversible error. See Griffin, 785 F.2d at 628.
 
 
 15
 At trial, the district court repeatedly asserted that it was not retrying Johnson for theft and refused to hear evidence on the theft investigation. However, after reviewing the record, we are left with the troubling impression that the internal investigation of Johnson may have been contaminated by racial bias. Rainbolt, the investigator assigned to Johnson's case, testified that his investigations led him to conclude that despite an acquittal, Johnson was in fact guilty. In so testifying, Rainbolt relied heavily on the statements he collected as part of his investigation. We have reviewed these documents. None of the witnesses interviewed by Rainbolt stated that Johnson stole the money. Indeed, some said they had never seen any money while others merely stated that Johnson took possession of the money along with the other evidence seized at the scene. However, Johnson never disputed that he confiscated the money at the time of the evidence seizure, and that information alone does not support a finding of guilt. Perhaps the ASP has other evidence that does demonstrate by a preponderance of the evidence that Johnson took the money but the affidavits submitted by the ASP do not do so. The issue of whether racial bias contaminated the internal investigation of Johnson is critical to a determination of whether or not the ASP acted in a discriminatory manner when it terminated Johnson. That issue was not considered by the district court.
 
 
 16
 On remand, therefore, the district court should evaluate whether racial bias infected the internal investigation and whether the ASP's assertion that Johnson had in fact misappropriated evidence was a genuine belief or a sophisticated pretext for discrimination. In light of our findings that the ASP may have discriminated against Johnson by suspending him without pay while similarly situated white officers were placed on administrative leave with pay, the district court should employ a mixed-motives analysis on remand. See Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). In addition, regardless of the ultimate outcome of Johnson's discriminatory discharge claim, the district court should determine whether Johnson is entitled to back pay for the time he was suspended without pay.[5]
 
 
 17
 Finally, we note that the ASP leaves itself open to allegations of discrimination because it has not formalized or standardized its suspension and discharge procedures. Until the ASP can come into court and present evidence that its actions were governed by a nondiscriminatory departmental procedure, the ASP will be hard-pressed to defend against this type of action.
 
 III. CONCLUSION
 
 18
 For the reasons stated above, we reverse the decision of the district court and remand for further proceedings consistent with this opinion.
 
 
 
 [1]
 Goodwin also relied on a letter from the CID investigator which stated that charges were pending against Johnson for three separate instances of theft of evidence. This information was not quite correct. As the investigator testified at trial, he had been informed that charges would be filed. However, he was reasonably sure that no charges had been filed, because he had not been contacted and he would be a primary witness at trial. The investigator made no effort to determine the truth or falsity of his previous representations to Goodwin, even though he knew that his letter would be important evidence against Johnson throughout the administrative process. In a December 21, 1989, letter to Johnson, Goodwin claimed to have investigated the circumstances involving the two other investigations. However, had he done so he would have discovered that those charges had never been filed and were no longer pending. Instead Goodwin wrote "I have inquired and did not discover any additional evidence." Appellees' Appendix at 105. All of the persons who considered Johnson's petition for reinstatement had false information in front of them. On remand, the district court should consider the effect, if any, that this false information may have had on the administrative process
 
 
 [2]
 Goodwin testified that there were only two newspaper stories about Johnson, one when he was charged and one when he was acquitted. In addition, Goodwin admitted that there had been no complaints from the public about Johnson. By contrast, Goodwin testified that other prosecutions of police officers in Arkansas, notably the Mullenax and the Booher cases, generated a great deal of television and other media coverage, and a significant public outcry. Transcript Vol. I, pp. 120-122; 216-19
 
 
 [3]
 The ASP did present one case in which a black officer charged with rape was suspended with pay. However, this suspension was for less than a day, and was the result of a mistaken identification. The actual perpetrator was arrested within hours
 
 
 [4]
 Absent the buttress of external evidence, the district court may find the testimony of the defendants to be merely self-serving. On remand, the district court should consider what weight, if any, to accord to this testimony
 
 
 [5]
 Our disposition of this case should not be read as a de facto entry of judgment for Johnson. We do not suggest that the ASP may not fire Johnson if they believe, in good faith, that he misappropriated evidence. Nor do we presume to substitute our judgment for that of the district court. Rather we ask the district court to review the evidence in light of the considerations we have expressed above